**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM L. GRANTZ, | ) | CASE NO. 5:16CV2033 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, William L. Grantz ("Plaintiff" or "Grantz"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I. PROCEDURAL HISTORY

In July 2013, Grantz filed applications for POD, DIB, and SSI, alleging a disability onset date of October 31, 2012 and claiming he was disabled due to vision problems, chronic obstructive pulmonary disease ("COPD"), diabetes, sleep apnea, and congestive heart failure. (Transcript ("Tr.") 13, 268, 303, 316.) The applications were denied initially and upon reconsideration, and Grantz requested a hearing before an administrative law judge ("ALJ"). (Tr. 201-207, 214-226.)

On April 16, 2015, an ALJ held a hearing, during which Grantz, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 115-161.) On May 18, 2015, the ALJ issued a written decision finding Grantz was not disabled. (Tr. 13-27.) The ALJ's decision became final on July 20, 2016, when the Appeals Council declined further review. (Tr. 1-6.)

On August 15, 2016, Grantz filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 16.) Grantz asserts the following assignment of error:

> (1) The Administrative Law Judge's finding that Plaintiff retained the residual functional capacity for light exertional-level work lacked the support of substantial evidence.

(Doc. No. 14.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Grantz was born in October 1963 and was fifty-one (51) years-old at the time of his administrative hearing, making him a "person closely approaching advanced age" under social security regulations. (Tr. 20.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). He graduated from

high school education, completed two years of college, and is able to communicate in English. (Tr. 20, 124.)  He has past relevant work as a grocery store manager, cashier-checker, and grocery store manager–trainee.  (Tr. 20.)

**B.    Relevant Medical Evidence**[2]

The record reflects Grantz presented to the emergency room ("ER") on several occasions in 2013 for complications arising from pneumonia.  On March 15, 2013, he presented to the ER complaining of a cough and mild swelling in his legs.  (Tr. 355-356.)  He reported a history of COPD and congestive heart failure, and stated he was not taking medication for either condition. (*Id.*)  On examination, Grantz's pulse oximetry fluctuated between 97% and 99% on room air. (*Id.*)  A chest x-ray taken that date showed a mild hazy right infrahilar opacity suggesting a mild or developing infiltrate.  (Tr. 355-356, 379.)  Grantz was diagnosed with early right lower lobe infiltrate and folliculitis.  (Tr. 355-356.)  He was given an aerosol treatment; prescribed Vicodin, Prednisone, Bactroban, Levaquin, Albuterol, and Tessalon Perles; and ordered to undergo a repeat chest x-ray in two weeks.  (*Id.*)

Grantz returned to the ER on March 28, 2013, complaining of shortness of breath and cough.  (Tr. 353.)  On examination, his lung fields were "basically clear," with "just minimal wheezes noted."  (*Id.*) Grantz underwent another chest x-ray which showed a right infrahilar opacity with "no interval change in the past two weeks."  (Tr. 352, 378.)  Grantz was prescribed another round of antibiotics as well as a tapering dose of steroids, and advised he would need a CT scan "done in the near future for further evaluation of that opacity."  (Tr. 352.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence identified in the parties' Briefs.

On April 11, 2013, Grantz again returned to the ER, complaining of a persistent cough and shortness of breath. (Tr. 350-351.) On examination, Grantz's "lung sounds were basically clear with an occasional cough and occasional bronchospastic wheeze." (*Id*.) Pulse oximetry was 97% on room air. (*Id*.) Grantz underwent another chest x-ray, which showed no acute cardiopulmonary disease. (Tr. 350-351, 357.) The ER physician determined the infiltrate had cleared and concluded "his main issue is that he continues to smoke." (Tr. 350-351.) The ER physician further found Grantz needed to be evaluated for sleep apnea. (*Id.*)

Grantz returned to the ER on May 3, 2013 with complaints of shortness of breath. (Tr. 363-365.) Grantz's blood pressure was elevated, at 167/96, and his pulse oximetry was 95%. (Tr. 364.) On examination, the ER doctor noted diminished breath sounds and scattered expiratory wheezes, but no crackles or rhonchi. (*Id*.) Grantz was noted to be obese, but there was no sign of clubbing, cyanosis or edema in his extremities. (*Id*.) Grantz was placed on a cardiac monitor and given supplemental oxygen, an aerosol treatment, and prednisone. (*Id*.) A chest x-ray taken that date showed no acute cardiopulmonary processes. (Tr. 365, 369.) Grantz's pulse oximetry remained in the mid to upper 90% range and he was discharged in stable condition after continuous aerosol treatment. (Tr. 365.)

On June 22, 2013, Grantz returned to the ER with complaints of headache and cough. (Tr. 361-362.) He underwent a chest x-ray which showed no acute cardiopulmonary process. (Tr. 362.) A CT of his head showed no acute intracranial abnormality, but did reveal mucosal thickening involving the bilateral maxillary sinuses suggestive of bacterial sinusitis. (Tr. 382.)

On August 2, 2013, Grantz began treatment with Jennifer Hiploylee, M.D. (Tr. 389-393.)

He complained of shortness of breath (both at rest and on exertion), wheezing, and cough. (Tr. 389.) Grantz was sedentary and concerned about being overweight. (*Id*.) He "says that he is trying to apply for disability and medical insurance, and the reason that he is here today is for a doctor's examination b/c that is required to start the paperwork for his application." (*Id*.) On examination, Dr. Hiploylee noted Grantz was 71.5 inches and 292 pounds, for a Body Mass Index ("BMI" ) of 40.16. (Tr. 390.) Grantz's blood pressure was elevated, at 150/70. (*Id*.) Dr. Hiploylee noted 1+ pitting edema in Grantz's bilateral extremities, but physical examination findings were otherwise normal. (*Id*.) She diagnosed (1) COPD; (2) morbid obesity; (3) suspected sleep apnea; (4) dyspnea on exertion; (5) history of drug use; (6) hypertension; (7) and polyuria (frequent urination). (Tr. 391.) Dr. Hiploylee ordered blood work and a pulmonary function test, and prescribed Ventolin (albuterol) and Lisinopril. (*Id*.) She felt Grantz needed both a sleep study and a 2D echocardiogram, but noted these tests would have to wait until he obtained medical insurance. (*Id*.)

Grantz underwent a pulmonary function test on August 5, 2013, which was normal. (Tr. 398-399.) His blood work confirmed diabetes, and he was started on Metformin. (Tr. 359, 387.)

Grantz returned to Dr. Hiploylee on August 16, 2013 with "new onset of type II diabetes." (Tr. 470-472.) His symptoms included "polydipsia, polyuria, diarrhea (chronic, 6 months), weight loss (intentional), and abnormal healing (prolonged healing time)." (Tr. 470.) Grantz also reported decreased exercise tolerance and difficulty breathing on exertion. (*Id*.) His BMI was slightly lower, at 39.2, and his blood pressure was 148/72. (*Id*.) Monofilament testing

was normal on the left, but abnormal on the right.[3]  (Tr. 471.)

Dr. Hiploylee diagnosed diabetes mellitus, hypertension, suspected sleep apnea, and shortness of breath.  (Tr. 471.)  She referred Grantz to diabetic education, provided diabetic diet and weight loss counseling, and prescribed a glucometer, lancets, and test strips for home monitoring of his blood sugar.  (*Id*.)  Dr. Hiploylee also referred Grantz for a polysomnogram to determine whether he suffered from sleep apnea.  (*Id*.)  Finally, she noted Grantz's PFT was essentially normal and determined his shortness of breath was "likely secondary to his body habitus."  (*Id*.)  She recommended Grantz lose weight; however, because Grantz complained his shortness of breath was worsening, she ordered a 2D echocardiogram to rule out cardiac etiology.  (*Id*.)

Grantz underwent the echocardiogram on August 21, 2013.  (Tr. 485-486, 469.)  It revealed Stage II diastolic dysfunction with left ventricular ejection fraction estimated at 60 to 65%.  (*Id*.)  Dr. Hiploylee prescribed Metoprolol and Lasix.  (Tr. 469.)

Grantz returned to Dr. Hiploylee on August 30, 2013 for treatment of shortness of breath. (Tr. 467-468.)  He described this condition as moderate in severity "and worsening," stating it was exacerbated by walking and climbing stairs.  (*Id*.)  Examination revealed normal gait and station.  (*Id*.)  Dr. Hiployee assessed diabetes mellitus, and congestive heart failure.  (*Id*.)  She noted Grantz had been compliant with his diabetes medication but, as his blood sugars remained high, she changed his medications, prescribing Lantus and Novolog.  (*Id*.)  Dr. Hiploylee later

---

[3] Monofilament testing is used to test for diabetic neuropathy.  It measures sensitivity to touch using a soft nylon fiber called a monofilament.  *See* http://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/basics/tests-diagnosis/con-20033336.

switched Grantz to Levemir as his insurance did not cover Lantus. (Tr. 466.)

On September 5, 2013, Grantz underwent a polysomnogram. (Tr. 483-484.) This test revealed (1) mild obstructive sleep apnea; (2) severe periodic limb movement during sleep; and (3) mildly abnormal sleep architecture with a predominance of lighter stages of sleep and sleep fragmentation possibly due to medications and/or first night effect. (*Id*.)

Grantz returned to Dr. Hiploylee on September 16, 2013, complaining of a cough. (Tr. 463-464.) At that time, he also reported blurred vision, chronic diarrhea, numbness and paresthesia, and polyuria. (Tr. 463.) His blood pressure was improved, at 124/84, and his BMI was slightly lower, at 38.51. (*Id*.) On examination, Grantz's lungs were normal and there was no edema. (Tr. 464.) Monofilament testing revealed Grantz could feel five out of five on his left foot, and three out of five on his right foot. (*Id*.) Dr. Hiploylee assessed diabetes mellitus and sleep apnea. (*Id*.) She counseled Grantz on diet and exercise, and stressed the importance of weight loss. (*Id*.) In addition, Dr. Hiploylee ordered a polysomnogram with CPAP titration to address Grantz's sleep apnea. (*Id*.) Grantz underwent this procedure on October 3, 2013, and was prescribed a CPAP machine. (Tr. 458, 477-479.)

On November 1, 2013, Grantz returned to Dr. Hiploylee for follow up of his diabetes. (Tr. 458-460.) He complained of blurred vision, chronic diarrhea, and numbness/paresthesia. (Tr. 458.) Dr. Hiployee noted that, "by report there is good compliance with treatment, good tolerance of treatment and poor symptom control." (*Id*.) Home glucose testing revealed a recent high glucose of 500 mg/dl, a recent low of 180 mg/dl, and a usual glucose range of 190-320 mg/dl. (*Id*.) His most recent Hgb A1c was high, at 9.6%.[4] (*Id*.) Dr. Hiploylee characterized

_____

[4]The normal range for Hgb A1c testing is 4.0 to 6.0%. *See e.g.*, Tr. 592.

7

Grantz's post prandial sugars as "still markedly high." (Tr. 459.) She increased his dosage of Levemir and Novolog. (*Id.*) In addition, Dr. Hiploylee advised Grantz to begin using his CPAP machine as soon as possible. (*Id.*) She characterized his hypertension as "well controlled." (*Id.*) Finally, with regard to his diarrhea, Dr. Hiploylee suspected it was due to his "uncontrolled diabetes" but ordered blood work to confirm. (*Id.*)

Grant presented to the ER on November 27, 2013, stating his blood sugar was over 500 and "he [did] not feel right since this morning." (Tr. 475-476.) The ER physician diagnosed hyperglycemia and diabetes, administered IV fluids until "the blood sugar was down to an acceptable level," and discharged Grantz home. (*Id.*)

On December 2, 2013, Grantz presented to Dr. Hiploylee with complaints of right upper quadrant abdominal pain which he rated an 8 on a scale of 10. (Tr. 455-456.) He described the pain as sharp and burning, and exacerbated by eating and drinking. (*Id.*) Grantz also continued to report high blood sugar levels. (*Id.*) Examination revealed tenderness in Grantz's right upper quadrant, and positive Murphy's sign. (*Id.*) With regard to Grantz's diabetes, Dr. Hiploylee again increased his Levemir and Novolog dosages. (*Id.*) With regard to his abdominal pain, she ordered blood work and an ultrasound of his abdomen. (*Id.*) The record reflects Grantz's Hgb A1c was again high, at 11.9%. (Tr 457.) Grantz underwent an ultrasound of his abdomen on December 9, 2013, which was suggestive of fatty infiltration. (Tr. 474.)

Grantz returned to Dr. Hiploylee on December 17, 2013. (Tr. 452-454.) He reported polyuria, chronic blurry vision, extremity numbness and paresthesia, and abdominal discomfort. (Tr. 452.) Dr. Hiploylee noted "poor symptom control" with respect to his diabetes, and remarked that Grantz's blood sugars remained high and his Hgb A1c was increasing. (Tr. 452-

453.)  She again increased Grantz's dosages of Levemir and Novolog, and ordered additional

blood work regarding his abdominal pain.  (*Id.*)  Grantz's blood work was positive for

Helicobacter pylori infection, and he was prescribed a "triple therapy" of three different

antibiotics.  (Tr. 451.)

On January 23, 2014, Grantz presented to Alan Meshekow, D.O., for evaluation of his

abdominal pain.  (Tr. 491-494.)  He reported "dull constant epigastric pain for approximately the

past 2 months," as well as chronic diarrhea.  (Tr. 492.)  Grantz denied blurred vision, joint pain

or swelling, paresthesias or limitation of motion of extremities.  (*Id.*)  He admitted some

shortness of breath and dyspnea on exertion but "denie[d] any limitation of activity."  (*Id.*)  On

examination, Dr. Meshekow noted Grantz's lungs were clear, his abdomen was nontender, and

his extremities were "within normal limits x 4 with satisfactory range of motion, no cyanosis,

varicosities, or edema."  (Tr. 493.)  He assessed possible chronic cholecystitis and ordered an

esophagogastroduodenoscopy ("EGD").  (*Id.*)

Grantz underwent a colonoscopy on January 29, 2014, which showed mild diverticulitis

and internal hemorrhoids but no polyps, masses, or other abnormalities.  (Tr. 564, 565.)  He

underwent an upper GI endoscopy on February 7, 2014, which showed Barrett's esophagus and

mild gastritis.  (Tr. 562, 563.)

On February 12, 2014, Grantz presented to Rajinder Maan, M.D., for follow up after his

colonoscopy and EGD.  (Tr. 557-560.)  He complained of polyuria, extremity numbness and

paresthesia, and abdominal discomfort, but stated his vision was "much better" after having

gotten glasses.  (Tr. 557.)  Dr. Maan noted Grantz showed good compliance with treatment and

found "fair symptom control."  (*Id.*)  Grantz's sugar logs revealed a recent high glucose of 340

mg/dl (down from 540 at last visit), a recent low glucose of 91 mg/dl (down from 247 at last visit), and an average glucose of 150 mg/dl. (*Id*.) Most physical examination findings were normal, including normal heart and lung sounds and no edema; however, monofilament testing was abnormal, with Grantz able to feel 6 out of 12 on the left foot and 8 out of 12 on the right foot. (Tr. 558.) Dr. Maan noted Grantz's diabetes symptoms "have been improving, blood sugar levels have been better controlled, has been compliant with his meds." (Tr. 559.) He continued Grantz on his medication regimen. (*Id*.)

Four days later, on February 16, 2014, Grantz presented to the ER complaining of shortness of breath. (Tr. 514.) The ER physician noted Grantz had "stage II, heart failure, and it feels more like that." (*Id*.) Grantz was admitted to the chest pain center, and underwent a full cardiac work-up. (Tr. 512-515.) His EKG, CT scan, chest x-ray, and serial cardiac enzymes were normal, and his stress test was negative. (Tr. 512-513, 515-516, 518-519, 556.) On discharge, Grantz was diagnosed with (1) dyspnea on exertion evaluation secondary to ischemic heart disease with multiple risk factors for same; and (2) hyperglycemia, history of diabetes. (Tr. 513.) He was discharged home in stable condition. (Tr. 512.)

On February 19, 2014, Grantz presented to Dr. Maan for follow up. (Tr. 544-546.) He complained of dyspnea, fatigue, palpitations, weakness and chronic cough, and stated his symptoms were exacerbated by walking, climbing stairs, and smoking. (Tr. 544.) Examination revealed tenderness in the epigastric region and trace edema in Grantz's bilateral lower extremities, but was otherwise normal. (Tr. 545.) Pulse oximetry was 97% on room air. (*Id*.) Dr. Maan advised Grantz to "continue taking blood pressure meds and lasix, should weigh himself, elevate extremities, use compression stockings, consume a low [salt] diet, exercise, and

smoking cessation." (*Id.*)

Grantz returned to Dr. Hiploylee on March 14, 2014, complaining of abdominal pain exacerbated by movement. (Tr. 539-541.) Examination revealed tenderness to the epigastric region, but was otherwise normal. (Tr. 540.) Dr. Hiploylee noted Grantz's "sugars appear better controlled," and his Hgb A1c level was improved at 9.5% (down from 11.9% in December 2013). (*Id.*) She increased Grantz's Lantus and Novolog dosages, counseled him regarding weight loss, and reminded him to start exercising, i.e., "walking 10 mins 3x daily, and then increase as endurance builds." (*Id.*) Dr. Hiploylee also referred Grantz for another CPAP titration, as he complained the "pressure is too high." (*Id.*)

On March 17, 2014, Grantz returned to Dr. Meshekow with complaints of continued abdominal pain. (Tr. 488-490.) Dr. Meshekow recommended Grantz undergo a laparoscopic cholecystectomy. (Tr. 489.) Grantz agreed, and underwent the procedure on April 16, 2014. (Tr. 490, 583-584.)

Meanwhile, on March 18, 2014, Grantz underwent another CPAP titration study. (Tr. 498-500.) This study demonstrated obstructive sleep apnea, and moderate periodic limb movement during sleep. (*Id.*) It was recommended Grantz's CPAP be adjusted to 18 cmH2O and that he undergo "medically supervised weight loss to achieve ideal body weight" and "immediate smoking cessation." (*Id.*)

On April 18, 2014, Grantz returned to Dr. Hiploylee for follow up of his diabetes. (Tr. 596-598.) Dr. Hiploylee noted Grantz's HgbA1c was decreasing, and his fasting sugars were significantly improved but his post prandial sugars were "still high." (Tr. 596.) She described his symptom control as "good." (*Id.*) Dr. Hiploylee maintained his Lantus dosage, but increased

his Novolog and again counseled Grantz "extensively" on diet and exercise and smoking cessation.  (Tr. 597.)

Grantz returned to Dr. Meshekow on April 21, 2014 for follow up after his surgery.  (Tr. 580-582.)  He stated he was eating well with no nausea, vomiting, or pain.  (Tr. 581.)  Dr. Meshekow found Grantz's surgical scars were well healed with no signs of infection, and indicated "overall progress is good."  (*Id*.)  On May 5, 2014, Grantz reported some incisional drainage, but no fever, chills, nausea, or vomiting.  (Tr. 577-579.)  Dr. Meshekow found "some skin separation most likely due to his obesity," cleaned the area, and reassured Grantz there was no active infection.  (Tr. 578.)  On May 15, 2014, Grantz reported decreased drainage.  (Tr. 575.)  On June 16, 2014, he was "without complaint," with no further incisional drainage or pain.  (Tr. 571-573.)  Dr. Meshekow noted Grantz's abdomen was "super morbidly obese," but "incisions are all strong will heal by granulation and no evidence of infection."  (Tr. 572.)

On June 20, 2014, Grantz returned to Dr. Hiploylee for follow up regarding his diabetes.  (Tr. 590-592.)  He complained of shortness of breath, and numbness and parethesias in his lower extremities.  (Tr. 590.)  Monofilament testing revealed Grantz could feel 2 out of 5 on the left foot, and 3 out of 5 on the right.  (Tr. 591.)  Dr. Hiploylee noted that "fasting sugars sometimes run low, will not make changes to Lantus now," but "will increase Novolog . . . as post prandial sugars are a little higher."  (*Id*.)  She also found Grantz's monofilament test was "worse this time."  (*Id*.)  She diagnosed diabetic neuropathy and prescribed Amitriptyline.  (*Id*.)  Additionally, Dr. Hiploylee ordered testing of Grantz's Hgb A1c, which was found to be 7.3%.  (Tr. 591-592.)

On July 28, 2014, Grantz presented to Angelin Rajaratnam, M.D., for treatment of his

diabetes. (Tr. 619-620.) He complained of chronic cough and diarrhea. (*Id.*) Examination of Grantz's lungs was normal, and he had "normal heart sounds, regular rate and rhythm with no murmurs." (Tr. 620.) There was no sign of edema. (*Id.*) Dr. Rajaratnam increased his Lantus and Novolog dosages. (*Id.*)

On September 9, 2014, Grantz returned to Dr. Maan. (Tr. 617-618.) He complained of fatigue, extremity numbness and impaired healing ("cuts take long to heal"), and indicated his "sugar levels have been elevated for the past month." (Tr. 617.) There was no sign of edema. (Tr. 618.) Dr. Maan noted "fair symptom control" and stated "since diabetes diagnosis, control has been improving." (Tr. 617.) However, his recent glucose levels had been high and Dr. Maan again increased his Novolog dosage. (Tr. 618.) Grantz's Hgb A1c was retested and found to be slightly higher at 8.2% (up from 7.3% in June 2014). (Tr. 612.)

Grantz returned to Dr. Rajaratnam on November 12, 2014. (Tr. 610-611.) She noted that "recently diabetes control has been worsening." (*Id.*) Monofilament testing showed Grantz could feel 6 out of 12 on both his left and right feet. (*Id.*) Dr. Rajaratnam increased Grantz's Lantus dosage, and discussed the "option of referral to endocrinologist." (*Id.*) Grantz "want[ed] to wait until he tries this new [medication] regimen." (*Id.*)

On December 3, 2014, Grantz's blood sugar levels were improving somewhat, and Dr. Rajaratnam indicated his recent "diabetes control has been stable." (Tr. 607.) Grantz reported that he tried to walk ten minutes everyday. (*Id.*) Dr. Rajaratnam encouraged him to try to walk 30 minutes three times per week, and increased his Novolog dosage. (Tr. 608.)

Grantz presented to the ER on December 15, 2014 after falling the previous day. (Tr. 606.) An x-ray of his lumbar spine showed disc height loss most prominent at L4-L5, but no

visible fracture or dislocation. (Tr. 605.) Grantz returned to the ER two days later, on December 17, 2014, with complaints of nausea, dry heaves, fever, neck pain, and chest discomfort. (Tr. 644, 655.) Cardiovascular examination was normal, and an EKG "showed no acute changes." (Tr. 655.) The ER doctor assessed gastroenteritis, and trapezius strain. (*Id*.) Grantz was discharged home in stable condition. (*Id*.)

On January 6, 2015, Grantz returned to Dr. Rajaratnam. (Tr. 601-604.) Grantz complained of neck pain relating to his accident, and extremity pain, numbness, and hypoglycemia symptoms relating to his diabetes. (Tr. 601.) He reported improvement in his polyuria, fatigue, vision, and insomnia. (*Id*.) Examination of Grantz's neck revealed tenderness to palpation, while examination of his cervical spine was normal. (Tr. 602.) Dr. Rajaratnam indicated that "since diagnosis diabetes control has been improving." (Tr. 601.) She continued Grantz on his medication regimen, and ordered Hgb A1c testing. (Tr. 602.) With regard to Grantz's neck pain, Dr. Rajaratnam referred him to physical therapy for possible muscle strain. (*Id*.) Grantz's Hgb A1c test was 8.4% (slightly higher than his result of 8.2% in September 2014). (Tr. 600.) Grantz agreed to see an endocrinologist. (*Id*.)

On February 11, 2015, Grantz presented to Dr. Rajaratnam for follow up regarding his diabetes. (Tr. 633-635.) He complained of polydipsia, polyuria, blurry vision "more often than before," extremity numbness and paresthesia, and foot numbness with discolored and thickened toenails. (Tr. 633.) Dr. Rajaratnam indicated Grantz's diabetes control "has been worsening," citing his increasing Hgb A1c level and high blood sugar levels. (*Id*.) Examination revealed trace edema but was otherwise normal. (Tr. 634.) On monofilament testing, Grantz could feel all 12 filaments on the left and 9 out of 12 on the right. (*Id*.) Dr. Rajaratnam increased Grantz's

morning Lantus dosage and again referred him to an endocrinologist.  (*Id*.)  She also ordered a Multilevel Lower Extremity Arterial Evaluation Report (or ankle-brachial index test) and transthoracic echocardiogram.  (*Id*.)

Grantz underwent these procedures on February 19, 2015.  (Tr. 627-629, 624-626.)  The Arterial Evaluation Report was normal.  (Tr. 627-629.)  The transthoracic echocardiogram revealed an ejection fraction of 60 to 65% and normal diastolic function.  (Tr. 623, 624-626.)  Additionally, the record reflects Grantz attended nine physical therapy sessions and was discharged after reporting 80% improvement in his neck pain.  (Tr. 630.)

On March 26, 2015, Grantz presented to endocrinologist Kevin Miller, M.D.  (Tr. 681-684.)  He reported a wide array of symptoms, including fatigue, persistent infections, weight gain, poor wound healing, skin discoloration, blurred vision, cough, shortness of breath, dyspnea, diarrhea, urinary frequency and urgency, back pain, joint pain, joint stiffness, muscle pain, swelling of extremities, numbness and tingling in his extremities, excessive thirst, and excessive urination.  (Tr. 682.)  Physical examination findings were normal, including "no generalized swelling or edema of extremities."  (Tr. 683.)  Dr. Miller noted fair compliance with and tolerance of treatment, and characterized Grantz's glucose data as "very erratic at times (low 100's to mid 200's)."  (Tr. 681.)  He assessed diabetes mellitus, type II, uncontrolled; and "severely overweight."  (Tr. 683.)  Dr. Miller added Invokana to Grantz's medication regimen and referred him for a diabetic foot examination.  (*Id*.)  He also ordered Hgb A1c testing, which was 7.8%.  (*Id*.)

On April 23, 2015, Grantz underwent a Functional Capacity Evaluation ("FCE") with physical therapist Sue Budiscak, P.T.  (Tr. 688-700.)  Grantz reported he was unable to stand or

walk for greater than 20 minutes consecutively because of burning and pain in his calves and feet. (Tr. 688.) He reported the ability to ascend and descend stairs reciprocally using a railing, and to cook primarily in a seated position. (*Id.*) Grantz stated he was not able to lift a laundry basket, but was able to bend to get pots and pans out of the bottom shelves of his cupboard. (*Id.*) On examination, Grantz's bilateral upper extremity strength was 5/5; his upper back strength was 4+/5; his bilateral lower extremity strength was 4+5/5; and his trunk strength was 4+5/5. (Tr. 689.) His cervical range of motion and bilateral upper extremity range of motion were within normal limits; however, he had limited lumbar, bilateral hip, and bilateral ankle range of motion. (*Id.*) Grantz demonstrated bilateral straight leg raising to 75 degrees. (*Id.*) He "ambulated into and out of the department displaying normal cadences, although a slightly increased wide base of support." (*Id.*) He reported intact sensation to light and deep touch in the distal portion of each lower extremity, although he reported an increase in the burning sensation with palpation. (*Id.*) Grantz's perceived capacity was just below sedentary on the EPIC spinal function sort. (Tr. 690.) Ms. Budiscak noted Grantz "displayed discrepancies in answers to [two questions] . . . , which is indicative of discrepancies in reliability of answers throughout the evaluation." (*Id.*)

Grantz was able to complete the entire FCE which included infrequent lifting testing, frequent lifting testing, MET testing, and positional testing. (*Id.*) He demonstrated the ability to sit statically for 40 minutes consecutively and alternating at 15 to 20 minutes between sitting unsupported in a moderate amount of lumbar flexion to sitting supported against the back of a chair filling out his paperwork. (*Id.*) Grantz performed sustained posturing reaching overhead during which he was in no apparent distress and displayed excellent finger dexterity. (*Id.*) In terms of infrequent lifting, Grantz was able to (1) lift 30 pounds floor to knuckle, indicative of

16

the medium physical demand category; (2) lift 20 pounds knuckle to shoulder, indicative of the light physical demand category; (3) lift 20 pounds shoulder to overhead, indicative of the light physical demand category; (4) carry 10 pounds, indicative of the sedentary physical demand category; and (5) push and pull with 25 pounds of horizontal force, indicative of the medium physical demand category. (Tr. 691-692.)

Throughout the FCE, Grantz "stood and walked for 20 minutes consecutively with the client taking a break, not stating that his legs were burning but primarily because of [shortness of breath] from the activity that was asked of him." (Tr. 691.) Ms. Budiscak also noted as follows:

> Functional movement testing was assessed during today's Functional Capacity Evaluation. The client was able to ascend and descend the stairs for 10 repetitions using a reciprocal pattern and 1 railing. The client displayed normal cadence. Following this activity, the client exhibited [shortness of breath]. Following this test, the client reported his bilateral feet and ankle pain as a 2-3/10, bilateral lumbar pain as a 3-4/10, bilateral calf and leg pain as a 1/10, all per the functional pain scale. The client was able to statically balance on each [lower extremity] for 10"/30". The client was able to crawl for a distance of 30 ft requiring assistance to assume and get out of the crawling position. The client did crawl in a reciprocal pattern and reported his bilateral feet and ankle pain as a 2-3/10, bilateral lumbar pain as a 2-3/10, bilateral calf and leg pain as a 1/10, all per the functional pain scale and exhibited [shortness of breath] following this activity.

(Tr. 692.) Grantz terminated treadmill testing after two minutes with complaints of increasing pain in his bilateral feet, ankles, calves and legs. (Tr. 693.)

Ms. Budiscak found "the majority of testing today is indicative of the client being in the low effort category with his heart rate falling below the 1.25x resting heart rate needed to indicate more than low effort." (*Id*.) Grantz demonstrated high reliability as to his reporting regarding the functional pain scale; however, he demonstrated low reliability as to repeated movement testing. (Tr. 693-694.) Based on the results of the testing, Ms. Budiscak determined

17

Grantz "would safely be able to perform activities in the light physical demand category for lifting knuckle to shoulder and shoulder to overhead on an infrequent basis and be able to carry in the sedentary physical demand category." (*Id.*) Finally, she noted "[p]ain was a consistent limiting factor for the client throughout today's Functional Capacity Evaluation." (*Id.*)

## C.     State Agency Reports

On November 5, 2013, Grantz underwent a consultative opthalmological examination with Jeffrey L. Congeni, M.D. (Tr. 430-443.) Grantz complained of blurry vision, stating his "vision has been decreasing significantly over past two years." (Tr. 437.) He stated he was unable to work due to shortness of breath, no energy, and blurry vision. (*Id.*) Upon visual acuity testing, Dr. Congeni determined Grantz's distance vision, with best correction, was 20/30 -1 +2 on the right and 20/25 on the left. (Tr. 430.) His reading vision, with best correction, was 20/20 on the right and 20/20 on the left. (*Id.*) Dr. Congeni also found Grantz had a trace cataract in his right eye and vitreous debris in both eyes. (Tr. 430, 431, 438.) He advised Grantz that new glasses would improve his visual acuity, and recommended he undergo yearly eye exams due to his diabetes. (Tr. 438.)

On November 6, 2013, state agency physician Esberdado Villanueva, M.D., reviewed Grantz's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 167-168.) Dr. Villanueva determined Grantz had no exertional, postural, manipulative, visual, or communicative limitations. (*Id.*) He did, however, find Grantz should avoid concentrated exposure to environmental pollutants, such as fumes, odors, dusts, gases, poor ventilation, etc. (*Id.*)

On January 6, 2014, state agency physician Linda Hall, M.D., reviewed Grantz's medical

records and completed a Physical RFC Assessment. (Tr. 186-187.) Dr. Hall concluded Grantz could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday. (*Id.*) She found he had unlimited push/pull capacity and no postural, manipulative, visual, or communicative limitations. (*Id.*) Finally, Dr. Hall found Grantz should avoid concentrated exposure to environmental pollutants, such as fumes, odors, dusts, gases, poor ventilation, etc. (*Id.*)

**D.     Hearing Testimony**

During the April 16, 2015 hearing, Grantz testified to the following:

- He graduated from high school, and completed a two-year college program in business management. (Tr. 124.) He lives with his son, daughter-in-law, and two grandchildren. (Tr. 122.) He no longer has a driver's license. (Tr. 123.) His license expired in 2007, and he did not renew it because he did not feel safe driving due to his vision problems. (*Id.*)

- He worked in the past as a cook, janitor, merchandiser, cashier/clerk, and grocery store manager. (Tr. 125-128.) He was a store manager for six years, from April 2001 to February 2007. (Tr. 128.) In that position, he lifted between 25 and 50 pounds on a daily basis. (Tr. 132.)

- He suffers from diabetes, which he described as "poorly controlled." (Tr. 135.) His doctors have changed his medications and increased his dosages several times. (*Id.*) He takes medication for neuropathy, but it has not really helped. (*Id.*) He checks his blood sugars three to four times per day, and takes his diabetes medications as instructed. (Tr. 146.) He does not exercise, however, because of his foot and leg pain and swelling. (*Id.*) He has to elevate his legs each day due to swelling. (Tr. 144-145.) He spends 50 to 75% of his day "with his legs up and down." (Tr. 145.)

- He also suffers from sleep apnea, blurry vision, and gastrointestinal problems. (Tr. 136-137, 147-148.) He sees a pulmonologist for his sleep apnea. (Tr. 136.) He got glasses sometime around 2013 and they seemed to help for awhile but "now I'm starting to get the blurred vision again." (Tr. 137.) The blurry vision prevents him from driving and causes headaches. (Tr. 147.) As for his gastrointestinal problems, he has constant diarrhea on a daily basis. (*Id.*) He is

"kind of able to control it for the most part," but sometimes "it hits [him] so fast and so strong that there's nothing [he] can do." (Tr. 148.) He has diarrhea four to five times per day, during which he spends five to seven minutes in the restroom per each episode. (*Id*.)

- He can no longer work because of pain and neuropathy in his feet and legs. (Tr. 132-133.) If he walks or stands for more than five to ten minutes, his feet hurt and the lower part of his legs ache and swell. (Tr. 132-133, 138.) If he sits down and elevates his legs, the pain and achiness go away after about 20 minutes. (Tr. 133-134.) If he does not sit down and elevate his legs, the pain gets worse and "has been so severe that it's had me almost in tears at times." (Tr. 134.) When he sits down, he experiences numbness and tingling in his toes. (*Id*.) He also experiences pain when sitting down, which he rated a three or four on a scale of 10, as well as swelling. (Tr. 134, 138.)

- On a typical day, he wakes up at 6:30 a.m., takes his meds, and lies back down until 8:30 a.m. (Tr. 139.) He then wakes up, has breakfast, takes his insulin, and makes sure his five year old grandson has something to eat. (*Id*.) He sits most of the day, or "lounges," because "there's not much [he] can do around the house." (*Id*.) He reads and watches television. (Tr. 139-140.) He no longer has any hobbies, and has not hiked or biked in four years. (Tr. 140.)

- He is the main caregiver for his five year old grandson during the day. (Tr. 139.) However, he does not have to do much because his grandson "pretty much does everything himself." (*Id*.) He really just has to feed his grandson breakfast and lunch. (*Id*.) He cooks dinner for the whole family as well. (*Id*.) He has to sit down while cooking because it is too painful for him to stand. (Tr. 141.) He also washes the dishes and goes grocery shopping. (*Id*.) When washing dishes, he pulls a seat in front of the sink and sits down while washing. (Tr. 149.) When grocery shopping, he tries to use the motorized cart whenever possible. (Tr. 141.) His daughter-in-law does the cleaning. (*Id*.)

- Over the course of an 8 hour workday, he could probably stand for a total of two to three hours. (Tr. 145-146.)

The VE testified Grantz had past work as a preparation cook (SVP 2, medium); janitor (SVP 2, performed as light); cashier checker (SVP 3, performed as medium); grocery store manager trainee (SVP 6, performed at medium); grocery store manager (SVP 7, performed as medium); and office manager (SVP 4, performed as light). (Tr. 150-154.) The ALJ then posed the following hypothetical question:

> My first hypothetical . . . is simply assume a hypothetical individual of the
> claimant's age and education with the past jobs that you described and further
> assume this individual is — is limited to medium work, but no exposure to dust,
> odors, fumes, and pulmonary irritants. . . Can the hypothetical individual perform
> any of the past jobs you described as actually performed or generally performed
> in the national economy?

(Tr. 154.)  The VE testified the hypothetical individual would be able to perform Grantz's past

work as a preparation cook, grocery store manager, grocery store manager trainee, officer

manager, cashier checker, and janitor.  (Tr. 154-156.)

The ALJ then asked a second hypothetical that was the same as the first but restricted the

hypothetical individual to "a limited range of light work with the same restriction on the irritants

that I mentioned before."  (Tr. 156-157.)  The VE testified such an individual could perform

Grantz's past work as the grocery store manager and grocery store manager trainee (as generally

performed), cashier checker (as generally performed), office manager (both as actually and

generally performed), and janitor (as actually performed).  (Tr. 157.)  The VE further testified

there were other representative jobs in the national economy that the hypothetical individual

could perform such as housekeeping cleaner (SVP 2, light); cashier II (SVP 2, light); and fast-

food worker (SVP 2, light).  (Tr. 157-158.)

Grantz's attorney then asked the VE the following hypothetical:

> [I]f we were to take the same hypothetical individual in hypothetical two,
> however, this individual would be limited to standing a total of two hours of an
> eight hour day for no more than 10 minutes at a time, how, if at all, would that
> affect your responses to the previous hypothetical?

(Tr. 158.)  The VE testified "I would take it down to light work," which she clarified to mean

that the hypothetical individual would be limited to sedentary work.  (Tr. 158-159.)  The VE

further testified such an individual would not be able to perform any of Grantz's past work.  (Tr.

159.)

Finally, Grantz's counsel asked the VE to assume the same hypothetical individual but "also add that this hypothetical individual would need to take . . . three unscheduled work breaks a day lasting five to seven minutes." (Tr. 159.) The VE testified there would be no jobs for such a hypothetical individual. (*Id.*)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. *See* 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6ᵗʰ Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. *See* 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. *See* 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6ᵗʰ Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in

"substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Grantz was insured on his alleged disability onset date, October 31, 2012, and remained insured through December 31, 2013, his date last insured ("DLI.") (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Grantz must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since October 31, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.    The claimant has the following severe impairments: diabetes mellitus, with diabetic neuropathy, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may never be exposed to pulmonary irritants, including dust, odors, gases, fumes, or poor ventilation.

6.    The claimant is capable of performing past relevant work as a grocery store manager (DOT #185.167-046), having a light exertional level designation [but which the claimant performed at the medium exertional level] and a specific vocational preparation factor of seven. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has been under a disability, as defined in the Social Security Act, from October 31, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 13-27.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and

Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston

v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of

Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

25

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

*RFC*

In his sole assignment of error, Grantz argues the ALJ's finding that he can perform light work is not supported by substantial evidence. (Doc. No. 14 at 10.) He asserts the ALJ erred in analyzing the medical record, which Grantz claims fully documents his repeated complaints of shortness of breath, and swelling, pain, numbness, and tingling of his legs due to diabetic neuropathy. (*Id.*) Grantz also maintains the ALJ erred in determining his daily activities were inconsistent with disability, noting he rides in a motorized cart while grocery

shopping, can only cook while sitting down, and spends most the day "lounging."  (*Id*. at 12.)

Lastly, Grantz argues the ALJ erred in evaluating the impact of Grantz's obesity on his

symptoms and limitations.  (*Id*. at 12-13.)

The Commissioner argues substantial evidence supports the ALJ's decision.  (Doc. No.

16 at 11.)  She maintains the ALJ correctly considered Grantz's activities of daily living,

including Grantz's statements in disability paperwork that his condition did not impair his ability

to perform daily activities.  (*Id*.)  The Commissioner further notes the ALJ properly relied on the

fact Grantz made inconsistent statements about his employment, and showed poor effort during

his Functional Capacity Evaluation.  (*Id*. at 12.)  Finally, the Commissioner argues the ALJ

properly considered Grantz's obesity in formulating the RFC.  (*Id*. at 12-13.)

The RFC determination sets out an individual's work-related abilities despite his or her

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774

F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140,

148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined, at step two, that Grantz has the severe impairments of diabetes mellitus, with diabetic neuropathy; and obesity. (Tr. 15.) At step three, the ALJ found Grantz's impairments did not meet or medically equal the severity of a Listing. (Tr. 16.) In particular, the ALJ noted as follows:

> In reaching the conclusion that the claimant's impairments do not rise to listing level, I considered the effect his obesity has on his other impairments and on his ability to perform routine movement and necessary physical activity within the work environment. I also considered how his obesity may cause fatigue that would affect his ability to function physically pursuant to Social Security Ruling 02-lp. Because the physical examinations contained in the record were mostly unremarkable, I do not find that the claimant's obesity either singularly or in combination with his other medically determinable severe impairments results in limitations greater than those assessed in this opinion.

(*Id.*)

The ALJ then proceeded, at step four, to consider the medical and opinion evidence regarding Grantz's physical impairments. (Tr. 17-20.) The ALJ first acknowledged Grantz's obesity:

28

In terms of the claimant's alleged obesity, the claimant reported a body weight of 294 pounds on August 5, 2013, which corresponds to a body mass index in excess of thirty eight (2E/2). This is consistent with a body weight of 291 pounds, recorded on March 17, 2014 (7F/3), and a body weight of 297 pounds, recorded on April 10, 2015 (18F/ l). Although no direct medical evidence indicates that the existence of this impairment causes the claimant excess fatigue, or otherwise unduly restricts his ability to move about freely within the workplace, this impairment has nevertheless been included for its contributory effects, potentially marked, on the claimant's other severe impairments.

(Tr. 17-18.) The ALJ then discussed Grantz's diabetes and diabetic neuropathy. (Tr. 18.) While the ALJ acknowledged this condition would be consistent with Grantz's allegations of numbness and tingling in his feet, the ALJ determined the record as a whole was not "supportive of the contention that the existence of this impairment would be preclusive of all types of work." (*Id*.) The ALJ explained as follows:

The record would indicate that the claimant has been unable to establish consistent or effective control over this impairment. The claimant's hemoglobin alc levels have vacillated between 7.3% (12F/5) and 11.9% (6F/ 10). However, the claimant's compliance with treatment, including diet, exercise (13F/10) and medications, has been only "fair" (l7F/2).

Physical examinations included in the record have consistently, albeit not universally, reported either minimal, or normal findings, including one dated May 3, 2013, which indicated no focal neurological deficits (2F/5), one dated June 20, 2014, which reported decreased, but no absent, sensation on monofilament testing (12F/4), or one dated February 11, 2015, which indicated a normal response to nine of twelve test sites on the right foot, and normal findings on all points on the left foot (14F/13).

The claimant has followed a regimen of prescription medications intended to address these impairments (4E/3), (6E/3), (8E/ l), without side effects (6E/3); however, I do note that the only medication directed to the claimant's neuropathy is a sedative and tricyclic anti-depressant (8E/l ), (hearing testimony), rather than any of the more typical nerve conduction suppressants.

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. In a setting where the claimant would be restricted to work at the light exertional level, and would avoid all exposure to fumes, odors, dust, gases and poor ventilation, adequate allowance will have been

made for these impairments.

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: in disability reports, dated December 10, 2013 (4E/4) and January 15, 2014 (6E/4),the claimant reported that his conditions caused no effect on his ability to care for his personal needs, and had wrought no changes in his activities of daily living. This seems somewhat of an overstatement, in light of his hearing testimony; however, the record does indicate that he is responsible for the care of his five-year-old grandson during the daytime, that he is responsible for preparing the family's meals, shopping for groceries, that he is able to use a computer and reads for pleasure (hearing testimony), (4El4). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

The claimant has made inconsistent statements on issues central to the disposition of these claims. In his disability report, the claimant indicated that he stopped working because of an economically driven layoff (2E/2), rather than because of his medical impairments. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

There is evidence that the claimant exerted a poor effort on examinations. During a functional capacity evaluation, dated April 23, 2015, the claimant was noted to display discrepancies in reliability of reporting (19F/3), and to have put forth a poor effort on testing (19F/5) for the majority of the time (19F/6).

(Tr. 18-19.)

The ALJ then considered the opinion evidence, according "some weight" to the opinions of state agency physicians Drs. Villaneuva and Hall that Grantz could perform work at the medium exertional level but must avoid concentrated exposure to environmental pollutants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. 19.) The ALJ acknowledged these physicians each had the opportunity to review Grantz's records, but found "the subsequent

diagnosis of neuropathy, the presentation of the claimant during the hearing, and the imperative to resolve doubts in the claimant's favor all combine to militate in favor" of a restriction to light (as opposed to medium) work with the environmental restrictions noted above. (*Id.*) The ALJ then accorded "considerable weight" to Dr. Congeni's opinion that Grantz would have poor vision without glasses. (*Id.*)

Finally, the ALJ considered the Functional Capacity Evaluation conducted by physical therapist Sue Budiscak. (Tr. 19.) He weighed this opinion as follows:

> Although not received of an acceptable medical source, the following opinion was nevertheless considered, pursuant to the regulations.
>
> Little weight was accorded the opinion of the physical therapist, Sue Budiscek [sic], PT, that the claimant could perform no more than sedentary work. Ms. Budiscek [sic] administered an objective functional capacity evaluation and was reporting within the bounds of her professional certifications. However, these factors are outweighed by her reports of the claimant's "poor effort" (19F/5), throughout the majority of the testing (19F/6), his failure to attempt various sub-tests (19F/6) and the known discrepancies in the reliability of his reporting (19F/3). On the whole, this does not appear to render valid results. Little weight was accorded this opinion as a result.

(*Id.*) The ALJ concluded by stating that "[n]o other treating or examining physician or other medical health provider rendered an opinion relevant to the formulation of the residual functional capacity." (Tr. 20.)

The ALJ formulated the following RFC: "After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work[5] as

---

[5] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do

defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may never be exposed to pulmonary irritants, including dust, odors, gases, fumes, or poor ventilation." (Tr. 17.)

Grantz argues the ALJ erred because the medical evidence supports a finding of no more than sedentary work.[6] The Court disagrees. Substantial evidence supports the ALJ's findings that physical examination findings have been largely (though not universally) normal. Specifically, on the whole, Grantz's treatment records have revealed normal gait and station; no cyanosis, variscosities, or edema in his extremities; normal pulses; normal chest and lung findings; and normal muscle strength. (Tr. 467-468, 464, 493, 558, 540, 620, 618, 683, 689.) While Grantz's monofilament test results varied over time, the record reflects he could feel all 12 filaments on his left foot and 9 out of 12 filaments on his right foot during his most recent test in February 2015. (Tr. 634.) Additionally, during his Functional Capacity Evaluation in April 2015, Grantz reported intact sensation to light and deep touch in the distal portion of each lower extremity. (Tr. 689.)

---

substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

[6] "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a). SSR 83–10 provides that "Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

Substantial evidence also supports the ALJ's conclusion that Grantz has been "unable to establish consistent or effective control" over his diabetes and, further, that his "compliance with treatment, including diet, exercise, and medications, has only been 'fair.'" (Tr. 18.) The ALJ accurately acknowledged that Grantz's blood sugar and Hgb A1c levels have remained high, despite regular treatment and numerous medication adjustments. However, the ALJ also noted indications in the record that, while Grantz has complied with his medications and blood sugar monitoring, he has not fully complied with other important treatment recommendations, including repeated counseling to lose weight, exercise, and stop smoking. (Tr. 499, 513, 540, 545, 590, 557.) For example, the record reflects Grantz's physicians repeatedly counseled him to stop smoking; however, he continued to smoke throughout the relevant time period, including at the time of the hearing. (Tr. 138, 596, 590, 619, 617, 601, 633, 682, 686.) In addition, the record reflects Grantz weighed 292 pounds for a BMI of 40.16 when he started treatment with Dr. Hiploylee in August 2013, and weighed 297 pounds for a BMI of 40.85 during an appointment in April 2015. (Tr. 390, 686.) Additionally, the record reflects that, in February 2015, Dr. Rajaratnam noted "since diagnosis, diabetes control has been worsening;" and, in March 2015, Dr. Miller noted only "fair compliance with treatment." (Tr. 633, 681.)

The Court finds the ALJ's RFC assessment is also supported by the opinion evidence in the record. Indeed, Grantz does not direct this Court's attention to any medical opinion in the record indicating he has physical functional limitations greater than those set forth in the RFC. Moreover, and has been discussed previously, state agency physician Dr. Hall opined Grantz could perform medium work, while Dr. Villanueva opined he had no exertional or postural limitations of any kind. (Tr. 167-168, 186-187.)

Grantz, however, argues that physical therapist Sue Budiscak found him capable of less than sedentary work and the ALJ erred in failing to accord greater weight to this opinion. (Doc. No. 14 at 11.) As an initial matter, it is not entirely clear that Ms. Budiscak, in fact, found that Grant was "capable of less than sedentary work." Rather, Ms. Budiscak is somewhat equivocal on this point, finding Grantz "would safely be able to perform activities in the light physical demand category for lifting . . . [but] able to carry in the sedentary physical demand category." (Tr. 694.) Nevertheless, assuming *arguendo* Ms. Budiscak's report could be construed as Grantz suggests, the Court finds the ALJ properly discounted Ms. Budiscak's findings. "A physical therapist is not an acceptable medical source under the Commissioner's regulations." *Waldrup v. Astrue*, 2010 WL 2490423 at *5 (E.D. Ky. June 18, 2010). Rather, a physical therapist is an "other source" pursuant to 20 C.F.R. § § 404.1513(d) and 416.913(d),[7] which is not subject to the "good reasons" requirement of the treating physician rule. *See Sisky v Colvin,* 2016 WL 4418104 at * 8 (N.D. Ohio Aug. 19, 2016); *Pyotsia v. Astrue*, 2013 WL 101932 at * 6 (N.D. Ohio Jan. 8, 2013). According to Social Security Ruling ("SSR") No. 06–03p, 2006 WL 2329939 (Aug. 9, 2006),[8] however, an ALJ must still consider opinions and findings from "other sources:"

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must

---

[7] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[8] SSR 06-03p has been rescinded as to disability claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 15, 263 (March 27, 2017).

> consider and what the adjudicator must explain in the disability determination
> or decision, the adjudicator generally should explain the weight given to
> opinions from these "other sources," or otherwise ensure that the discussion of
> the evidence in the determination or decision allows a claimant or subsequent
> reviewer to follow the adjudicator's reasoning, when such opinions may have
> an effect on the outcome of the case.

*See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (noting the ALJ should have provided some basis as to why he was rejecting the opinion of an "other source"); *Hatfield v. Astrue*, 2008 WL 2437673 (E.D. Tenn. Jun. 13, 2008) (noting that "[t]he Sixth Circuit ... appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight [given to an 'other source' opinion], as opposed to leaving the decision whether to explain to the ALJ's discretion"); *Pyotsia*, 2013 WL 101932 at * 6.  Indeed, "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file."  SSR 06-03p, 2006 WL 2329939 at * 3.[9]

Here, the Court finds the ALJ's analysis of Ms. Budiscak's findings satisfies the regulatory requirements for consideration of opinions from "other sources."  The ALJ expressly acknowledged the Functional Capacity Evaluation conducted by Ms. Budiscak in April 2015, and provided several reasons for discounting her conclusions regarding Grantz's physical

---

[9] When evaluating evidence from this type of "other source" the ALJ should consider: "such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06- 03P, 2006 WL 2329939.

functional capacity.  Specifically, the ALJ explained Ms. Budiscak's opinions were entitled to "limited weight" in light of Ms. Budiscak's own conclusions that Grantz put forth "'poor effort' (19F/5), throughout the majority of the testing (19F/6), . . . fail[ed] to attempt various subtests (19F/6), and the known discrepancies in the reliability of his reporting (19F/3)."  (Tr. 19.) Grantz does not articulate any meaningful basis for concluding (or cite any legal authority suggesting) it was improper for the ALJ to discount Ms. Budiscak's opinion on this basis.

Because Ms. Budiscak is an "other source," the ALJ was not required to accord any particular weight to her opinions regarding Grantz's physical functional limitations, nor was he required to provide "good reasons" for rejecting them.  Rather, the ALJ was required only to evaluate Ms. Budiscak's opinions using the applicable factors set forth in the regulations.  *See Cruse*, 502 F.3d at 541.  For the reasons set forth above, the Court finds the ALJ properly evaluated Ms. Budiscak's opinion and, further, properly discounted it on the basis of Grantz's poor effort and "discrepancies in the reliability of his reporting."  Accordingly, to the extent Grantz is arguing the RFC is not supported by substantial evidence because the ALJ improperly rejected Ms. Budiscak's opinion, the Court finds that argument is without merit.

Grantz next argues the RFC is not supported by substantial evidence because " the ALJ erred in evaluating the impact of [his] obesity on his symptoms and limitations."  (Doc. No. 11 at 12.)  The Sixth Circuit has recognized that "an ALJ 'must consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.' "[10] *Shilo v.*

---

[10] The Social Security Administration ("SSA") considers obesity to be a medically determinable impairment. SSR 02–1 p, Introduction, 2002 WL 34686281 at *1. Although the Listings previously included obesity as an impairment, the SSA deleted it in 1999, and added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  *Id.*  The

*Comm'r of Social Security*, 600 Fed. Appx. 956, 958 (6th Cir. 2015) (quoting *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009)). *See also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834–835 (6th Cir. 2016). As explained in SSR 02–01p, "[o]besity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02–01p, 2002 WL 34686281, at *2. It must be considered throughout the ALJ's determinations, "including when assessing an individual's residual functional capacity," precisely because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id*. at *1.

That being said, the Sixth Circuit has found that SSR 02–01p "does not mandate a particular mode of analysis of obesity." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411–412 (6th Cir. 2006). *See also Shilo*, 600 Fed. Appx. at 959; *Miller,* 811 F.3d at 835. Rather, the Ruling "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *See Bledsoe*, 165 Fed. Appx. at 411–412 ("It is a mischaracterization to suggest that Social Security Ruling 02–01p offers any particular procedural mode of analysis for obese disability claimants.") Therefore, to the extent Grantz's brief suggests the ALJ violated SSR 02–01p by failing to perform an analysis of his obesity in a particular manner, his argument lacks merit.

After careful review of the decision, the Court finds the ALJ properly addressed Grantz's obesity and considered its impact on Grantz's other impairments (including his diabetes) at each step in the sequential evaluation. As set forth above , at step two, the ALJ

SSA also recognizes that obesity may cause or contribute to mental impairments such as depression or the loss of mental clarity due to obesity-related sleep apnea. SSR 02–1 p, Policy Interpretation Question 2, 2002 WL 34686281 at *3.

recognized obesity as one of Grant's severe impairments. (Tr. 15.) At step three, the ALJ expressly considered the effect of Grantz's obesity on his other impairments in determining he did not meet or equal a Listing, concluding that "because the physical examinations contained in the record were mostly unremarkable, I do not find that the claimant's obesity either singularly or in combination with his other medically determinable severe impairments results in limitations greater than those assessed in this opinion." (Tr. 16.) Next, at step four, the ALJ squarely addressed Grantz's obesity, noting he weighed 294 pounds and had a BMI in excess of 38 in August 2013, weighed 291 pounds in March 2014, and weighed 297 pounds in April 2015. (Tr. 17-18.) At this step, the ALJ explained he considered the contributory effects of Grantz's obesity despite the fact that "no direct medical evidence indicates that the existence of this impairment causes the claimant excess fatigue or otherwise unduly restricts his ability to move about freely within the workplace." (Tr. 18.)

In light of the above, the Court finds the ALJ did not, as Grantz suggests, fail to fully consider the effects of his obesity on his ability to "sustain functions over time." (Doc. No. 13 at 15.) Rather, the ALJ adequately addressed Grantz's obesity and considered its combined impact on Grantz's other impairments at each step in the sequential evaluation. Moreover, the ALJ assigned "some weight" to the opinion of state agency physician Dr. Hall, who was aware of Grantz's obesity and considered its impact with respect to his complaints of shortness of breath. (Tr. 184, 186) (referencing Grantz's height and weight, and fact that he experiences shortness of breath due to obesity.) By according weight to Dr. Hall's opinion (and, in fact, imposing greater restrictions than those offered by Dr. Hall), the ALJ incorporated the effect of Grantz's obesity in formulating the RFC. *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx.

435, 443 (6th Cir. 2010) ("[W]hen assigning Coldiron an RFC, the ALJ considered RFCs from physicians who explicitly accounted for Coldiron's obesity... Thus, by utilizing the opinions of these physicians in fashioning Coldiron's RFC, the ALJ incorporated the effect that obesity has on the claimant's ability to work into the RFC he constructed."); *Bledsoe,* 165 Fed. Appx. at 412 (finding an ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity); *Miller*, 811 F.3d at 835 (noting an ALJ satisfies SSR 02–1p "so long as she credits 'RFCs from physicians who explicitly accounted for [the claimant's] obesity.' "). *See also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (stating "although the ALJ did not explicitly consider [claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

Grantz, however, argues the ALJ's analysis was insufficient because "treating and examining physicians throughout the record very clearly attributed many of Plaintiff's symptoms – from shortness of breath to abdominal discomfort to sleep difficulties to swelling, pain, and his diabetes in whole– to his obesity." (Doc. No. 11 at 13.) The Court rejects this argument. As noted above, substantial evidence supports the ALJ's conclusion that, despite Grantz's obesity, physical examination findings have been largely normal, including normal gait and station; no cyanosis, variscosities, or edema in his extremities; normal pulses; normal chest and lung findings; and normal muscle strength. (Tr. 467-468, 464, 493, 558, 540, 620, 618, 683, 689.) While Grantz's physicians have noted the effect of his "body habitus" on his diabetes and shortness of breath (and advised him on numerous occasions to lose weight), Grantz has not demonstrated these findings (standing alone) warrant greater restrictions in the RFC. Indeed, Grantz points to no medical opinion that physical functional limitations beyond

those included in the RFC are required to account for his impairments.  Accordingly, the Court finds the ALJ properly considered Grantz's obesity and its combined impact on Grantz's other impairments at step four.

Finally, Grantz argues the ALJ erroneously concluded his daily activities are inconsistent with disability.  (Doc. No. 14 at 12.)  He asserts the ALJ mischaracterized the cited activities and, when properly considered, these activities demonstrate he can tolerate no more than a sedentary RFC.  In particular, Grantz argues the ALJ failed to acknowledge his testimony that he can only go grocery shopping when he uses a motorized cart; prepare meals only when sitting down; and care for his grandson but only because he did not have to do much for him. (*Id.*)

The Court finds this argument to be without merit.  The ALJ correctly noted that, in disability reports submitted to the SSA in December 2013 and January 2014, Grantz represented that his condition did not affect his ability to care for his personal needs.[11]  (Tr. 319, 326.) Moreover, contrary to Grantz's suggestion in his Brief, Grantz did not testify at the hearing that he could only grocery shop while riding in a motorized cart.  Rather, he testified that "[i]f I'm at a store that has the electronic carts to ride around on, it's a lot easier for" him to grocery shop, but otherwise he completes his shopping and "tr[ies] to do as little as possible and get in and out if I have to walk through the store."  (Tr. 141.)  Finally, even assuming the ALJ neglected to acknowledge Grantz's testimony that he can only prepare meals while sitting down, the Court finds any error in this regard harmless.  As discussed at length above, the ALJ's decision that

---

[11] Specifically, in December 2013, Grantz was asked the question "How do your illnesses, injuries, or conditions affect your ability to care for your personal needs?" (Tr. 318.)  He answered "it doesn't."  (*Id.*)  In January 2014, Grantz was asked the same question and he responded "no change." (Tr. 326.)

Grantz can perform light work with environmental restrictions is supported by substantial evidence in the record, including Grantz's physical examination findings and the opinion evidence.

Accordingly, and for all the reasons set forth above, the Court find the RFC is supported by substantial evidence. Grantz's argument to the contrary is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 31, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**